CORNELIA COLE MCLOUGHLIN ET AL., ADMINISTRATORS, *vs.* THE BRIDGEPORT LAND AND TITLE COMPANY.

Third Judicial District, Bridgeport, April Term, 1923.
WHEELER, C. J., BEACH, BURPEE, KEELER and KELLOGG, Js.

In an action on a policy of title insurance, which the defendant claimed it was induced to issue by fraud and concealment of facts, it appeared that one S, as trustee of real estate with a power of sale, agreed to mortgage the premises to M, the plaintiffs' predecessor in title; that the defendant refused the application to insure the

title, because of doubt as to S's power to mortgage; that a plan was then devised and consummated by which S transferred the property to H without consideration, and H gave back an ostensible purchase-money mortgage which S assigned to M; that the defendant then insured the title, and that thereafter the mortgage was legally adjudged invalid as being in effect given by S who lacked power so to do. The trial court found that the defendant, when issuing the policy, had actual knowledge of the true nature of the transaction between S and H, and was not induced by fraud or the concealment of any material fact, to issue its policy of insurance. *Held* that this finding, which had support in the testimony, including that of the presence of defendant's vice-president in the room when the conveyance to H was made, was decisive of the case against the defendant.

Argued April 17th—decided June 1st, 1923.

ACTION upon a policy issued by the defendant insuring the title of an alleged purchase-money mortgage, brought to and tried by the Superior Court in Fairfield County, *Webb, J.;* facts found and judgment rendered for the plaintiff for $39,445, and appeal by the defendant. *No error.*

The complaint in this action, upon a policy insuring Charles McLoughlin and his successors in title against loss, not exceeding $35,000, by reason of defects of title existing at the date of the policy, alleged that in a foreclosure suit the mortgage in question had been declared void, because the same had been, in effect, though not in name, given by one Shaw, trustee, who had no authority as trustee to mortgage the premises. The answer admitted that the mortgage had been declared invalid for the reason stated, and alleged as a defense that the defendant had been induced to issue the policy by false and fraudulent representations of the insured, to the effect that Shaw, trustee, had sold and conveyed the premises to one Hamilton, and that the mortgage to be insured was a purchase-money mortgage executed by Hamilton and assigned by Shaw, trustee, to McLoughlin. In the

course of the foreclosure suit above referred to it had been established as a fact, not disputed in this action, that the conveyance by Shaw, trustee, to Hamilton, and the mortgage back from Hamilton to Shaw, trustee, was a purely fictitious transaction, the real effect of which was that Shaw, trustee, had himself mortgaged the premises. By the terms of his trust deed Shaw had express authority to sell the premises and to "charge" them, but no authority to mortgage, unless that power was implied or included in the authority to charge. Because of the uncertainty as to Shaw's authority to mortgage, the defendant had declined to insure McLoughlin's title as mortgagee of a proposed mortgage by Shaw, but had, in response to an inquiry, intimated that it would be willing to insure a purchase-money mortgage; and this fiction, whereby Shaw and Hamilton went through the form of a sale and mortgage, was for the purpose of putting into Shaw's hands a purchase-money mortgage which would be insurable after being assigned to McLoughlin.

On the trial the only questions of fact in dispute were those which bore on the decisive issue of fraud by misrepresentation or concealment. The court found that the defendant at and before the issuance of the policy had full knowledge of all the facts, and was not induced to issue the policy by the suppression of any material fact.

The material subordinate facts found, and not already summarized, are as follows:—

The matter was first brought to the attention of the defendant by McLoughlin submitting to it, as title searcher and prospective insurer, a written contract between McLoughlin and Shaw, trustee, whereby McLoughlin agreed to sell to Shaw certain lands and tenements in the city of Brooklyn, New York, for the sum of $40,000, of which $5,000 was to be paid

in cash, and $35,000 by the note of Shaw secured by the premises in Norwalk held by Shaw under his trust deed. This contract also provided that to enhance the security of the mortgage Shaw was to use his best endeavor to develop a portion of the premises as high class residential property and to sell and account for building lots, which, when sold and accounted for, were to be released from the mortgage. In aid of these provisions Shaw was to deposit with the South Norwalk Trust Company $5,500 as security for the construction of a roadway through the premises.

The defendant examined the title and declined to insure the proposed mortgage for the reason indicated. At a subsequent conference between Mr. Brown, representing McLoughlin, and Messrs. Canfield and Marsh, representing the defendant, the authority of Shaw, trustee, to mortgage the premises was discussed, and the defendant persisted in declining to insure a mortgage executed by Shaw, trustee. At that interview Brown inquired whether the defendant would insure a purchase-money mortgage and was told that it would, because the trustee's power to sell was not questioned. Brown later suggested to Shaw that one of the brokers should act as purchaser. A deed from Shaw to Hamilton was drawn and submitted for approval to the defendant, with a request to prepare a purchase-money mortgage for $40,000 back to Shaw, and an assignment of a $35,000 interest therein to McLoughlin. At the same time a written modification of the original contract between McLoughlin and Shaw was submitted to the defendant, in which it was provided that the $5,500 to be deposited by Shaw as security for his agreement to develop the premises as residential property, was to be deposited with McLoughlin instead of with the South Norwalk Trust Company.

The transaction was closed at Brown's office in New York on April 5th, 1913, in the presence of Marsh, Shaw, Hamilton, McLoughlin and Brown. Marsh took with him a warranty deed from Shaw, trustee, to Hamilton, a purchase-money mortgage and a note for $40,000 from Hamilton to Shaw, trustee, and a quitclaim deed from Shaw, trustee, to Hamilton, assigning to McLoughlin an interest of $35,000 in the mortgage. These papers, except the warranty deed from Shaw, trustee, to Hamilton, had been prepared by the defendant. At this meeting Shaw, in the presence and hearing of Brown, McLoughlin and Marsh, asked Hamilton whether he would act as purchaser and execute the $40,000 mortgage and note to Shaw, which the latter proposed to assign to McLoughlin. Hamilton replied that he would, provided he was released by McLoughlin from personal liability on the mortgage note. Brown thereupon prepared the release, which was executed by McLoughlin, in the presence of Marsh, and delivered to Hamilton who thereupon in the presence of Marsh, executed the note and mortgage to Shaw. During the same meeting at Brown's office, Hamilton executed and delivered to Shaw an agreement to reconvey the premises subject to the mortgage to Shaw, trustee. This reconveyance was afterward executed and was recorded in the Norwalk land records, and some three months after the transaction was closed and the policy issued, Marsh's attention was called to the fact that such reconveyance had been recorded, and he expressed no surprise and took no action in regard to the matter.

In April, 1917, James McLoughlin, representing the interest of Charles, then deceased, brought an action for the foreclosure of the mortgage, in which it appeared, without dispute, that the warranty deed from Shaw, trustee, to Hamilton, and the mortgage

back from Hamilton to Shaw were wholly without consideration; that there was no real sale of the premises to Hamilton and no real purchase-money mortgage acquired by Shaw, trustee. In that case it was adjudged, and affirmed on appeal, that the mortgage was in legal effect given directly by Shaw, trustee, to McLoughlin, and was void for lack of authority in the trustee to mortgage the premises. For a more complete account of the proceedings in that action see *McLoughlin* v. *Shaw*, 95 Conn. 102, 111 Atl. 62.

*William H. Comley,* for the appellant (defendant).

*Edward M. Lockwood,* with whom was *Herbert C. Brinckerhoff* of New York City, for the appellee (plaintiff).

BEACH, J. The controlling issue of fact on the trial was whether the defendant insurance company knew before the policy was issued that the transaction of April 5th, 1913, so far as it covered the execution and delivery of the warranty deed of the premises from Shaw, trustee, to Hamilton, and the contemporaneous execution and delivery of the so-called purchase-money mortgage from Hamilton to Shaw, trustee, was wholly without consideration.

It is admitted on the defendant's brief that if the findings of the trial court on this issue of fact are to stand as findings that the defendant had actual knowledge of that fact, as distinguished from conclusions that the defendant had imputed or constructive notice of that fact, the judgment is supported by the facts found.

It is, however, contended, first, that these findings should be construed as meaning no more than that the defendant's vice-president, Marsh, must be held

to have known the real nature of the transaction between Shaw and Hamilton because he ought to have discovered it; and second, that if construed as affirmation of actual knowledge on Marsh's part, they are unsupported by legal evidence.

The material findings on this point are as follows: "23. The defendant by its representative the said Marsh, knew that the consideration for the transfer and conveyance of said land from said Shaw, Trustee, to said Hamilton was the execution and delivery to said Shaw by said Hamilton of his note of $40,000 and the said purchase-money mortgage; and the defendant knew that the transaction was modified as aforesaid, and later carried out as so modified in order to meet the aforesaid objection of the defendant to a mortgage executed by said Shaw, Trustee, and the refusal of the defendant to insure such a mortgage, and the defendant had full knowledge of all the details of said transaction. . . .

" 38. That the defendant, by its representative the said Marsh, prior to the delivery of said policy of insurance, knew all the facts relevant to the making of the mortgage assigned to Charles McLoughlin and insured by the defendant, and was not deceived by any representations made by McLoughlin, or his agent, A. L. Brown, and was not induced to issue said policy of title insurance by the suppression of any material fact in connection with said transaction.

"39. That the defendant, by its representative the said Marsh, prior to the date of the issuing of said policy of title insurance, knew that William J. Hamilton was not a bona fide purchaser for value from William G. Shaw, Trustee, of the premises described in the mortgage from Hamilton to Shaw as trustee; knew that the contract made with Shaw, trustee, January 31, 1913, and modified April 2, 1913, was to be

carried out by said Shaw, Trustee, in all its details; knew that said Shaw was to retain possession of said property, and devote the money received from said mortgage to the improvement and development of the same for his children under the trust deed, and knew he was to exercise the same rights of ownership in, and control over said property in the same manner as he would have done if he had himself, as trustee, given said mortgage."

On their face, these are findings of actual knowledge. The distinction between actual knowledge and imputed notice is in this case important, chiefly, if not wholly, because a finding limited to imputed notice might be consistent with the conclusion that the defendant, though careless, was in fact induced to issue the policy by the failure of the plaintiff to disclose the real nature of the transaction between Shaw and Hamilton. The finding, however, is both inclusive and exclusive: not only that the defendant did know the facts, but also that it was not induced to issue the policy by the suppression of any material fact. It is therefore impossible to discover in the finding itself any intent to charge the defendant with constructive notice merely, as distinguished from actual knowledge; and so the substantial question is whether there is legal evidence to support the finding of actual knowledge by the defendant's vice-president acquired in the course of the transaction.

It is admitted that there is evidence from which the court might have found that Marsh had a reasonable opportunity to discover the real nature of the transaction, and that the court might have charged him with imputed notice, if Marsh had been under any obligation to investigate the transaction, which is denied; and, we may add, very properly denied. It is also asserted with truth that there is no evidence of

any direct communication made to Marsh of the fact that Hamilton was not a bona fide purchaser for value; and no evidence of an inquiry prosecuted by defendant and resulting in a disclosure of the fact. Nevertheless, the question remains whether the evidence was such that the trial court might, in the exercise of its undoubted right and duty to draw proper inferences from the evidential or subordinate facts, have reasonably concluded that the defendant, by its vice-president Marsh, did have actual knowledge of the real nature of the transaction between Shaw and McLoughlin.

If the defendant had at any time positively taken the position that Shaw, trustee, did not have power to mortgage the premises, it would be hard to believe that it could thereafter have insured the mortgage in question as a "purchase-money" mortgage, with knowledge of the fact that the purchase by Hamilton and the mortgage back to Shaw were wholly without consideration and wholly ineffective except to prevent the defect of title from appearing on the face of the land records.

The finding, however, shows, and on this point no correction is asked for, that the defendant, after examining the title of Shaw, as trustee, advised McLoughlin, as follows: "that the power of said Shaw, as trustee under said deed of trust to mortgage said lands might be questioned by subsequent purchasers of said lands or parts thereof, and if the defendant insured the validity of the proposed mortgage by said Shaw, as trustee, the defendant, as such insurer, might be involved in litigation, and be put to expense in connection therewith, and although it might be said that said Shaw, as trustee, had the power to mortgage said lands under said deed of trust, the defendant would not care to insure the validity of the proposed mortgage to be executed by Shaw as trustee." It was after

an ineffectual effort to overcome this objection that Brown asked whether the defendant would insure a purchase-money mortgage, and was told that it would.   At about this stage of the transaction, Mr. Canfield, the legal advisor of the defendant, ceased to take any part in the proceedings.  He had advised his client and his responsibility was at an end. It is also found and admitted that the mortgage was submitted to the defendant, as title searcher and prospective insurer, not as a separate and independent loan secured by mortgage deed, but as part of a somewhat complicated exchange of real estate titles between McLoughlin and Shaw, evidenced by a written contract, submitted to the defendant, whereby Shaw undertook to enhance the security of the mortgage by agreeing to develop the premises as a high class residential property, and to sell and account for portions thereof, in a manner which necessarily involved his retention of ownership of the equity, and control of the property as mortgagor in possession.   In this respect the contract was modified in detail, but not in substance, by the written modification of April 2d, 1913, also submitted to the defendant; and Marsh admits that he was fully aware of the provisions of the modified contract at the time of the closing on April 5th, 1913, so that he approached the closing of the transaction with the knowledge that Shaw's contract with McLoughlin was still in force and that on its face it contemplated the continued possession and control of the property by Shaw.   It has been suggested that Marsh may have supposed that there was a collateral agreement between Hamilton and Shaw for the execution of those plans for development; but he has not so testified.

Turning now to the closing of the transaction on April 5th, 1913, at Brown's office in New York.  Marsh

came there, bringing with him ready for execution the warranty deed from Shaw, trustee, to Hamilton, the mortgage back on the same premises from Hamilton to Shaw for $40,000, and the assignment, by quitclaim, of a $35,000 interest in the mortgage from Shaw to McLoughlin. These papers had been prepared or approved by the defendant. McLoughlin, Brown, Shaw, Hamilton and Marsh were gathered in Brown's private office, and seated so that ordinary conversation might be heard by all. It will not be necessary to go over the testimony as to what then took place, for it is conceded on defendant's brief that "if Mr. Marsh had heard and understood all that was said between Shaw, Brown and Hamilton, he would in all probability have observed, what is now known to be the fact, that the so-called sale to Hamilton was not a sale at all." There was no great conflict of testimony on what was said and done in Marsh's presence and hearing. The disputed question of fact was whether he did see and hear what was done and said in connection with the execution of the papers which he had brought there for that purpose. We think that the determination of such an issue of fact is one peculiarly within the province of the trial judge who saw and heard the witnesses; and we cannot say from an independent examination of all the evidence that the court erred in finding the facts complained of.

In view of this conclusion it will be unnecessary to discuss the propositions of law advanced on the defendant's brief as to the duty of an applicant for insurance to make full and frank disclosure of all material facts affecting the risk, and as to the right of the insurer to rely on the applicant's representations of fact without making any independent inquiry into their accuracy. Our determination is based on

the finding of the trial court that the insurer had actual knowledge of the material facts before the policy was issued, and was not induced to issue it by the suppression of any material fact by the assured, from which it follows that the defense of fraudulent misrepresentation or concealment cannot prevail.

There is no error.

In this opinion the other judges concurred.